IN  THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MICHAEL RAY STEMPLE             *
# 37084
Petitioner                     *

  v.                           *          Civil Action No. CCB-14-1500

WARDEN and                     *
THE ATTORNEY GENERAL OF THE
STATE OF MARYLAND              *

Respondents                    *

                              ***

## MEMORANDUM OPINION

Pending is Petitioner Michael Ray Stemple's ("Stemple") petition for writ of habeas corpus filed pursuant to 28 U.S.C. 2254.  Respondents, by their counsel, filed a response, (Answer, ECF No. 4), to which Stemple has replied, (Reply, ECF No. 6).  After consideration of the pleadings, exhibits, and applicable law, the court finds a hearing unnecessary.  *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts.* For the reasons set forth below, Stemple's Petition will be denied.

## BACKGROUND

Stemple, who is representing himself, challenges his 2011 convictions for sexual abuse of a minor in the Circuit Court for Frederick County, Maryland.  (Pet. 1-2,[1] ECF No. 1.)  The following is a summary of the facts of his conviction.

---

[1] All page citations reflect the ECF pagination.

In August 2010, Stemple was charged in the Circuit Court for Frederick County with multiple counts of sexual abuse of a minor and other offenses.  (Answer 3, ECF No. 4; Answer, Ex. 1, Circuit Court Docket, ECF No. 4-1.)   The victim was Stemple's sixteen-year-old stepdaughter. (Answer, Ex. 2, Plea Hrng. Tr. 11, ECF No. 4-2.)  On January 11, 2011, Stemple appeared with counsel and entered a guilty plea to one count of sexual abuse of a minor (Count Three), which had occurred on July 23, 2010, and an *Alford* [2] plea to a second count of sexual abuse of a minor, which had taken place sometime between August, 2009, and July 22, 2010 (Count Nine).  (Pet. 2, ECF No. 1; Answer, Ex. 2, Plea Hrng. Tr. 11, ECF No. 4-2.)  Stemple was sentenced on August 4, 2011, to fifty years imprisonment, with twenty-five years suspended, and five years of probation.  (Pet. 1, ECF No. 1; Answer, Ex. 3, Sent. Hrng. Tr. 20, ECF No. 4-3.)

Stemple, proceeding *pro se*, filed a Notice of Appeal, which was treated as an application for leave to appeal to the Court of Special Appeals of Maryland, on August 11, 2011.  (Pet. 2, ECF No. 1; Answer 5, ECF No. 4; Answer, Ex. 4, Notice of Appeal, ECF No. 4-4.)  He did not present specific grounds for review.  (Answer, Ex. 4, Notice of Appeal, ECF No. 4-4.)  The court summarily denied the application in an unreported opinion filed on June 18, 2012.  (Pet. 2, ECF No. 1; Answer, Ex. 4, June 18, 2012, Unreported Opinion, ECF No. 4-4.)  Its mandate issued on July 19, 2012.  (Answer, Ex. 4, July 19, 2012, Mandate, ECF No. 4-4.)  Stemple did not seek further review by the United States Supreme Court.  (Pet. 2, ECF No. 1.)

On November 20, 2011, Stemple filed a *pro se* petition for post-conviction relief in the Circuit Court for Frederick County, followed by two supplements to that petition.  (Answer, Ex. 5, *Pro Se* State Petitions,  ECF No. 4-5.)  Subsequently, Stemple, through counsel, filed two

---

[2] *North Carolina v. Alford*, 400 U.S. 25 (1970).

supplemental petitions for post-conviction relief. (Answer, Ex. 6, Counseled State Petitions, ECF No. 4-6.) Stemple raised numerous claims of error, including the lack of a knowing and voluntary guilty plea, ineffective assistance of both plea and sentencing counsel, prosecutorial misconduct, and judicial error. (Answer, Ex. 7 1, Amended Opinion and Order, ECF No. 4-7.) After the hearing, the post-conviction court denied the petition on February 19, 2013. (Answer, Ex. 7, ECF No. 4-7; Respondents' Ex 10, November 15, 2012, Hearing Tr.).[3] Stemple filed an application for leave to appeal the adverse decision, (Answer, Ex. 8, Application for Leave to Appeal, ECF No. 4-8), which the Court of Special Appeals summarily denied, (Answer, Ex. 9, November 14, 2013, Unreported Opinion, ECF No. 4-9.) Its mandate issued on December 16, 2013. (Answer, Ex. 9, December 16, 2013, Mandate, ECF No. 4-9.)

The instant Petition was filed on May 3, 2014.[4] Stemple claims that:

(1) His counsel was ineffective for failing to disclose to the court that Stemple had filed a grievance against him;

(2) The Assistant State's Attorney erred by "read[ing] behind the plea agreement," failing to present a true victim impact statement, and stating her own belief;

(3) The judge erred by failing to drop the sexual abuse count to which Stemple entered an *Alford* plea because there was no evidence to prove that charge and by failing to inform Stemple that he had a limited period of time in which to withdraw his plea;

(4) His counsel was ineffective by failing to withdraw his plea at Stemple's request; and

(5) His sentence was illegal.

---

[3] Respondents' Ex. 10 is not docketed, as it is a lengthy exhibit. (Notice of Filing of Lengthy Exhibits, ECF No. 12.)

[4] The Petition was signed on May 3, 2014, and is deemed filed on that day. *See Houston v. Lack*, 487 U.S. 266, 276 (1988). It was received by the court on May 6, 2014.

Pet. 5-6, ECF No. 1.) Respondents filed an answer in which they argue that (1) Stemple's claims

fail under Habeas Rule 2; (2) three of his claims are not premised on federal law; (3) three of his

claims are unexhausted and/or procedurally defaulted; (4) the unexhausted claims, even if

cognizable, fail on the merits; and (5) the state court's ruling as to Stemple's exhausted claims

was a reasonable application of federal law that survives scrutiny under § 2254(d). (Answer 16-

23, ECF No. 4.) Stemple filed a reply, in the form of a letter to the court. (Reply, ECF No. 6.) [5]

## STANDARD OF REVIEW

Section 2254 states that a district court "shall entertain an application for a writ of habeas

corpus in behalf of a person in custody pursuant to the judgment of a State court only on the

ground that he is in custody in violation of the Constitution or laws or treaties of the United

States." 28 U.S.C. § 2254(a).

## I. Threshold Considerations

### A. Exhaustion

The exhaustion doctrine, codified at 28 U.S.C. § 2254(b)(1),[6] "is principally designed to

protect the state courts' role in the enforcement of federal law and prevent disruption of state

---

[5] This document fails to address the arguments presented in Respondents' Answer. Rather, Stemple complains that when he requested copies of transcripts from the State's Attorney's Office he received transcripts from a different case, not his. (Reply 1-3, ECF No. 6.) He also reiterates his request for counsel, (*id.*), which the court had previously denied. (Orders, ECF Nos. 5, 8.)

[6] Section 2254(b)(1) states that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that--
> (A) The applicant has exhausted the remedies available in the courts of the State; or
> (B) (i) there is an absence of available State corrective process; or
>    (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.
> (C) An applicant shall not be deemed to have exhausted the remedies available in the courts of the state, within the meaning of this section, if he has the right under the law of the state to raise, by any available procedure, the question presented.

28 U.S.C. § 2254(b)(1).

judicial proceedings.  Under our federal system, the federal and state courts [are] equally bound to guard and protect rights secured by the Constitution." *Rose v. Lundy*, 455 U.S. 509, 518 (1982)(alteration in original)(internal citations and quotation marks omitted).  Moreover, "it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation ...." *Id.*  Thus, the *Rose* Court cautioned litigants, "before you bring any claims to federal court, be sure that you first have taken each one to state court." *Id.* at 520; *see also O'Sullivan v. Boerckel*, 526 U.S. 838, 839 (1999)("Federal habeas relief is available to state prisoners only after they have exhausted their claims in state court.").

### B.  Procedural Default

In *O'Sullivan*, the Supreme Court stated: "To ... 'protect the integrity' of the federal exhaustion rule, we ask not only whether a prisoner has exhausted his state remedies, but also whether he has *properly* exhausted those remedies, *i.e.*, whether he has fairly presented his claims to the state courts." 526 U.S. at 848 (internal citation omitted); *see also id.* at 844 ("Section 2254(c) requires only that state prisoners give the state courts a *fair* opportunity to act on their claims.").  The inquiry, then, is "[w]hether a prisoner who fails to present his claims in a petition for discretionary review to a state court of last resort has *properly* presented his claims to the state courts.  ...  Because we answer this question 'no,' we conclude that [petitioner] has procedurally defaulted his claims." *Id.* at 848.  Stated differently, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *Id.* at 845.  The *O'Sullivan* Court noted, however, that:

In this regard, we note that nothing in our decision today requires the exhaustion

5

of any specific remedy when a State has provided that that remedy is unavailable. Section 2254(c), in fact, directs federal courts to consider whether a habeas petitioner has "*the right under the law of the State to raise, by any available procedure,* the question presented." (Emphasis added.)  The exhaustion doctrine, in other words, turns on an inquiry into what procedures are "available" under state law.  In sum, there is nothing in the exhaustion doctrine requiring federal courts to ignore a state law or rule providing that a given procedure is not available.

*Id.* at 847-48; *see also Breard v. Pruettt*, 134 F.3d 615, 619 (4th Cir. 1998)(quoting *Coleman v. Thompson*, 501 U.S. 722, 375 n.1 (1991))("A procedural default also occurs when a habeas petitioner fails to exhaust available State remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'").[7]

When a claim is procedurally defaulted, a federal court may not address the merits of a state prisoner's habeas claim unless the petitioner can show: (1) both cause for the default and prejudice that would result from failing to consider the claim on the merits; or (2) that failure to consider the claim on the merits would result in a fundamental miscarriage of justice, *i.e.*, the conviction of one who  is actually innocent.  *See Murray v. Carrier*, 477 U.S 478, 495-96 (1986). "Cause" consists of "some factor external to the defense [that] impeded counsel's efforts to raise the claim in State court at the appropriate time."  *Breard,* 134 F.3d at 620.  In order to demonstrate prejudice, a habeas petitioner must show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  *United States v. Frady*, 456 U.S. 152, 170 (1982); *see also Carrier*, 477 U.S. at 494 (quoting *Frady*).  Even when a petitioner

---

[7]  A procedural default may also occur when a state court declines "to consider the merits [of a claim] on the basis of an adequate and independent State procedural rule."  *Yeatts v. Angelone*, 166 F.3d 255, 260 (4th Cir. 1999); *see also Breard*, 134 F.3d at 619.

fails to show cause and prejudice for a procedural default, a court must still consider whether it should reach the merits of a petitioner's claims in order to prevent a fundamental miscarriage of justice. *See Schlup v. Delo*, 513 U.S. 298, 314-15 (1995).

### C. Strickland

When a petitioner alleges a claim of ineffective assistance of counsel, he must show both that counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Representation is deficient if it falls below an objective standard of reasonableness, considering all the circumstances. *Id.* at 688.

To satisfy the first part of this standard, it must be demonstrated that counsel's performance was not "within the range of competence normally demanded of attorneys in criminal cases." *Id.* at 687. The standard for assessing such competence is "highly deferential" and has a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *Id.* at 669. A federal court's consideration of ineffective assistance of counsel claims arising from state criminal proceedings is limited on habeas review due to the deference accorded trial attorneys and state appellate courts reviewing their performance. A petitioner must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (quoting *Strickland*, 466 at 689). "There is a strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect." *Harrington v. Richter*, 562 U.S. 86, 109 (2011)(citations and internal quotation marks omitted); *see also Sharpe v. Bell*, 593 F.3d 372, 383 (4th Cir. 2010)("Counsel is not required to engage in the filing of futile motions."). "The standards created by *Strickland* and

§2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so."  *Id.* at 105 (citations omitted).  "When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard."  *Id.*

The second prong requires the court to consider whether counsel's errors were so serious as to deprive the defendant of a fair trial where the result is reliable, and whether there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *Strickland*, 466 U.S. at 690-94.  "The benchmark of an ineffective assistance claim must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result."  *Id.* at 686.  It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding."  *Id.* at 693.  Rather, counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id.* at 687.  A determination need not be made concerning the attorney's performance if it is clear that no prejudice would have resulted had the attorney been deficient.  *See id.* at 697.

The principles governing ineffectiveness claims apply in federal collateral proceedings as they do on direct appeal or in a motion for new trial.  *Id.* at 697.  Indeed, the presumption that a criminal judgment is final is at its strongest in collateral attacks on that judgment.  *Id.*

Moreover, the same principles apply in the context of guilty pleas.  *See Hill v. Lockhart*, 474 U.S. 52, 57 (1985).  The *Hill* Court held that "the two-part *Strickland v. Washington* test applies to challenges to guilty pleas based on ineffective assistance of counsel."  *Id.* at 58; *see also Padilla v. Kentucky*, 559 U.S. 356, 371 n.12 (2010) ("In *Hill*, the Court recognized—for the first time—that *Strickland* applies to advice respecting a guilty plea.").  The first prong of the

*Strickland* test is nothing more than a restatement of the standard of attorney competence stated

above. *Hill*, 474 U.S. at 58.

> The second, or "prejudice" requirement, on the other hand, focuses on whether
> counsel's constitutionally ineffective performance affected the outcome of the
> plea process. In other words, in order to satisfy the "prejudice" requirement, the
> defendant must show that there is a reasonable probability that, but for counsel's
> errors, he would not have pleaded guilty and would have insisted on going to trial.

*Id.* at 59. The *Hill* Court reiterated that, as stated in *Strickland*, "these predictions of the outcome

at a possible trial, where necessary, should be made objectively ...." *Id.* at 59-60; *see also*

*Padilla*, 559 U.S. at 372 (noting that "to obtain relief on this type of claim, a petitioner must

convince the court that a decision to reject the plea bargain would have been rational under the

circumstances").

## II.     Analysis Framework

A federal court may not grant a writ of habeas corpus unless the state's adjudication on

the merits: (1) "resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the

United States" or (2) "resulted in a decision that was based on an unreasonable determination of

the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(a).

A state adjudication is "contrary to" clearly established federal law under § 2254(d)(1)

where the state court "arrives at a conclusion opposite to that reached by the [Supreme] Court on

a question of law" or "confronts facts that are materially indistinguishable from a relevant

Supreme Court precedent and arrives at a result opposite to [the Supreme] Court." *Williams v.*

*Taylor*, 529 U.S. 362, 405 (2000). Under the "unreasonable application analysis," a "state

court's determination that a claim lacks merit precludes federal habeas relief so long as

'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*

*v. Richter*, 562   U.S. 86, 101 (2011) (quoting *Yarborough. v Alvarado*, 541 U.S. 652, 664 (2004)).   In other words, "a federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly." *Renico v. Lett*, 559 U.S. 766, 773 (2010).

Under section 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).   "[E]ven if reasonable minds reviewing the record might disagree about the finding in question," a federal court may not conclude that the state court decision was based on an unreasonable determination of the facts. *Id.*

Further, "a determination of a factual issue made by a State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1) "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." *Sharpe*, 593 F.3d at 378.   This is especially true where the state court has "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." *Id.*

## DISCUSSION

### I.  Respondents' Arguments

Respondents argue that: (1) Stemple's claims are "incoherent" and, therefore, fail under Habeas Rule 2; (2) the claims fail to specify what federal constitutional right or provision was violated and are thus not cognizable; (3) Stemple has failed to exhaust or has procedurally defaulted his claims of prosecutorial and judicial error and illegal sentence because he failed to present them in his application for leave to appeal the adverse post-conviction decision to the

Court of Special Appeals;[8] and (4), in any event, the claims fail on the merits. (Answer 21-23, ECF No. 4.)   Further, with respect to Stemple's ineffective assistance of counsel claims, Respondents argue that, in denying post-conviction relief, the circuit court reasonably applied federal law and that, therefore, its decision survives scrutiny under 28 U.S.C. § 2254(d). (*Id.* at 16-21.)

Although the court agrees that the Petition is "incoherent," (*id.* at 21, ECF No. 4), bearing in mind its obligation to construe *pro se* filings liberally, *see Estelle v. Gamble*, 429 U.S. 97, 106 (1976), the court will not dismiss the petition on this ground alone.   Additionally, although Stemple fails to link his judicial error, prosecutorial error, and illegal sentence claims to violations of federal constitutional rights in the instant Petition, he did include references to federal violations in his state court filings.   (Answer, Ex. 5, *Pro Se* Supp. Pet. for Post-Conviction Relief 4, 7 ECF No. 4-5.)   Again reading the *pro se* documents liberally, the court will assume, for purposes of argument, that Stemple's claims are cognizable.   Whether presented to the state courts as they are here or not, (Answer 22, ECF No. 4), Respondents are correct that Stemple did not assert his prosecutorial misconduct, judicial error, and illegal sentence claims in his application for leave to appeal the denial of post-conviction relief, (*id.* at 23; *see also id.*, Ex. 8, App. for Leave to Appeal, ECF No. 4-8).   However, this court may deny an application for a writ of habeas corpus on the merits, "notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."   28 U.S.C. § 2254(b)(2).   Accordingly, the court turns to the merits of Stemple's claims.

---

[8] Respondents also argue that  the claims "were not presented as they are here in state court proceedings." (Answer 22, ECF No. 4.)

## II. Merits of Claims

### A. Ineffective Assistance of Counsel

As noted above, Stemple claims that his counsel was ineffective for: (1) failing to disclose that Stemple had filed a grievance against him (Ground One); and (2) failing to withdraw Stemple's guilty plea at Stemple's request (Ground Four).[9]  (Pet. 6, ECF No. 1.)  The post-conviction court denied both aspects of Stemple's ineffective assistance claim on the merits. (Answer, Ex.7 21-23, ECF No. 4-7.)

With respect to Stemple's first allegation, the circuit court stated:

Petitioner submits that ineffective assistance of counsel existed because Defense Counsel Stephen Musselman failed to inform the trial court that Petitioner had filed a grievance with the Attorney Grievance Commission against him, and Petitioner was, therefore, not provided the opportunity to obtain new counsel.

ANSWER

Relief on this allegation is denied on several grounds.  First, where the defendant created the issue, he is not entitled to relief on the matter.  *Ruth v. State*, 133 Md. App. 358, *cert. denied*, 361 Md. 435 (2000).  The Petitioner created the potential conflict of representation by filing a grievance against Mr. Musselman, and then failed to inform the trial judge that he had done so.

Furthermore, this Court finds credible Mr. Musselman's testimony that he discussed the grievance with Petitioner, and was told that he was comfortable with Mr. Musselman's representation, and did not want new counsel to represent him.

Finally, Petitioner has failed to set forth any law to support the allegation that a filing of a grievance with the Attorney Grievance Commission creates an actual conflict of interest that renders counsel's assistance ineffective.  In his Supplemental Petition for Post Conviction Relief, Petitioner states that "there are no Maryland cases on point."  (Supp. Pet. at 4).[10]  In fact, in the recent case of *Taylor v. State*, 428 Md. 386 (2012), the Maryland Court of Appeals explained that Maryland now adopts the three-part test set forth in *Mickens v. Taylor*, 240

---

[9] For convenience, the court has combined Stemple's first and fourth grounds for relief, both of which involve allegations of ineffective assistance of counsel.

[10] Here, the court included a footnote which stated that "Petitioner does, however, set forth non-binding caselaw from other jurisdictions."  (Answer, Ex. 7, Amended Opinion and Order 22 n.1, ECF No. 4-7.)

F.3d 348 (2001), for determining whether counsel's potential conflict of interest
had an actual adverse effect upon his performance.  "That test requires a petitioner
to establish: (1) a 'plausible alternative defense strategy or tactic that his defense
counsel might have pursued'; (2) 'that the alternative strategy or tactic was
objectively reasonable under the facts of the case known to the attorney'; and (3)
'that the defense counsel's failure to pursue that strategy or tactic was linked to
the actual conflict.'"  *Taylor, supra* at 415 (*citing Mickens*, 240 F.3d at 361).

  Petitioner has failed to meet his burden of setting forth any plausible alternative
defense strategy or tactic that Mr. Musselman might have pursued, establishing
that this alternative strategy was reasonable, or establishing that Mr. Musselman
failed to pursue that strategy.

 (Answer, Ex. 7, Amended Opinion and Order 21-22, ECF No. 4-7.)

    Although he was unsure of when he became aware that Stemple had filed a grievance

against him, Mr. Musselman testified that:

> It was, it was before the conclusion of my representation of him and I do
> remember going to my supervisor which I do when I get a grievance saying I have
> one, I'm still actively representing someone.  Should I re -- should you reassign
> this case.  And my memory with this case was that my supervisor told me to talk
> to Mr. Stemple to ask if his comfort level, ah, was he okay with me representing
> him. ...  I do remember having that discussion with him and him saying he was
> comfortable with me representing him.  That later changed and Ms. Teahan
> ending up representing him after me.

(Respondents' Ex. 10, Post-Conv. Hrng. Tr. 203-04.)     Mr. Musselman stated that he had

originally been assigned to represent Stemple on the witness tampering charge as well, but

"when the grievance interfered with that Ms. Teahan took it over."  (*Id.* at 204.)  On cross-

examination, Mr. Musselman was asked:

> Q     Okay.  Did you explain to Mr. Stemple after he had filed the grievance
> that he could have another lawyer?
>
> A     Yes.
>
> Q     And he indicated to you at that time that he wanted to do what?
>
> A     He was comfortable, he was comfortable with me.

(*Id.* at 207.)  Mr. Musselman testified that he did not inform the court of the pending grievance.

(*Id.*)

      Stemple's version of events was markedly different:

> After I had already gotten my sentence on August the 4th for this case here I did not know on the same day that, that I had a hearing for the jury tampering charge. That day.  I was never aware of that charge.  So, I mean of, of the hearing. So when I refused to take the deal, like two days later they took me back in, into the ... court ... for another, ah, deal.  Me and Musselman argued.  He came to the county jail and that's when he had told me that ... he had been grieved and I was probably gonna have to get a different attorney.  He was all mad.  He, he, because I wouldn't sit down and listen to more tapes that he came in there with, um, he got all mad.  He said that he was probably gonna have to withdraw as my attorney because, or he was gonna let the judge know that he needed to withdraw as my attorney because I had grieved him.  And his family was more important than me. That's what his exact words was.  And he took his little CD player thing, little computer or whatever it was, he packed it up and he walked out of, out of the, um, little cell there and then the next time when I seen Musselman  he was, we was in the courtroom and he was relieving hisself (sic) as my counsel [on the witness tampering charge].

(*Id.* at 44-45.)[11]  Asked by post-conviction counsel why he did not ask for a different attorney at

his sentencing hearing, Stemple stated that:

> [W]hen I told him I was gonna grieve him, he told me he didn't believe that I could get another public defender 'cause he was the third one and he didn't think that they was gonna give me another public defender to start with.  So I just assumed that I was gonna have to go with him unless I heard something from the Attorney Grievance Office ....

(*Id.* at 45-46.)

      As is clear from the Amended Opinion and Order, quoted above, the post-conviction

court credited Mr. Musselman's testimony over Stemple's.   Credibility determinations are

factual findings, *Sharpe*, 593 F.3d at 378, and this court must defer to the state court's factual

---

[11] Stemple, too, was uncertain as to when Mr. Musselman learned that Stemple had filed a grievance against him. Stemple testified that he filed the grievance on July 27, 2011.   (Respondents' Ex. 10, Post-Conv. Hrng. Tr. 165.) Asked whether Mr. Musselman was aware of the grievance prior to sentencing, Stemple testified that he was not sure.   (*Id.* at 44.)   He stated that he thought Mr. Musselman received notification of the grievance after the sentencing hearing, but he was not positive.   (*Id.*at 165-66.)

findings, *see* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").  Stemple has provided this court with no evidence (or argument) to rebut the presumption of correctness of the state court's credibility finding.  Simply put, Stemple has not met his burden.

Moreover, the circuit court properly recognized that the issue should be analyzed under the Supreme Court's conflicts jurisprudence.  *See Strickland*, 466 U.S. at 686, 692; *Cuyler v. Sullivan,* 446 U.S. 335 (1980);[12] *see also* (Answer, Ex. 7, Amended Opinion and Order 21-2, ECF No. 4-7.)  "A criminal defendant's Sixth Amendment right to effective assistance of counsel includes a right to counsel unhindered by conflicts of interest."  *Mickens*, 240 F.3d at 355.  In *Sullivan*, the Supreme Court stated: "In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance."  446 U.S. at 350; *see also Strickland*, 466 U.S. at 692 (quoting *Sullivan*).  The possibility of conflict is insufficient to impugn a criminal conviction.  *Sullivan*, 446 U.S. at 350.  "[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance."  *Id.*

Stemple has shown nothing more than a possibility of a conflict of interest, especially given his—and Mr. Musselman's—uncertainty regarding when Mr. Musselman learned that Stemple had filed the grievance.  Even if there had been an actual conflict, Stemple has not demonstrated that any conflict adversely affected Mr. Musselman's performance as his counsel.

---

[12] Although the Amended Opinion and Order cites primarily to state cases, those cases, in turn, relied on the Supreme Court's conflict of interest cases.  *See, e.g.*, *Taylor*, 428 Md.at 399-409 (citing, *inter alia*, *Strickland*, 466 U.S. 668; *Sullivan*, 446 U.S. 335).

*See Mickens*, 240 F.3d at 360.   Stemple has not pointed to any alternative strategy that Mr. Musselman failed to pursue due to the alleged conflict.  *Id.* at 361.   Although Stemple states that his "counsel was grie[]ved an[d] refused to withdraw[] my plea an[d] yet refused to notify proper commission," (Pet. 6, ECF No. 1), which could be construed as implying that Mr. Musselman's failure to withdraw the plea was a result of the grievance, assuming for the sake of argument that withdrawing the plea was a plausible alternative strategy, Stemple has not established that the alternative strategy was objectively reasonable under the facts of the case known to counsel or that counsel's failure to pursue that strategy was linked to the alleged conflict.  *Id.*  Therefore, Stemple has not demonstrated that Mr. Musselman's failure to disclose the filing of the grievance had an "actual adverse effect upon his performance."   (Answer, Ex. 7, Amended Opinion and Order 22, ECF No. 4-7.)

The circuit court's denial of Stemple's conflict claim was neither an erroneous nor an unreasonable application of clearly established federal law to the facts of the case.  28 U.S.C. §2254(d)(1).  Further, the court did not unreasonably determine the facts in light of the evidence presented at the post-conviction hearing.  *Id.* § 2254(d)(2).  Therefore, this portion of Stemple's ineffective assistance of counsel claim fails.

With respect to Stemple's allegation that counsel was ineffective for failing to withdraw Stemple's guilty plea when asked to do so, the circuit court found:

> Petitioner submits that ineffective assistance of counsel existed because Mr. Musselman failed to withdraw Petitioner's guilty plea upon his request.

ANSWER

> Relief on this allegation is denied.  This Court finds that the facts set forth supporting this allegation are untrue.  *See Washington*,[13] *supra* at 59 (denying an

---

[13] *Washington v. Warden, Maryland Penitentiary*, 1 Md. App. 56 (Md. Ct. Sp. App. 1967).

allegation where it is factually incorrect).  This court finds that the Petitioner did not request Stephen Musselman to withdraw his plea.  The Petitioner did not object at the sentencing hearing when Mr. Musselman stated that Petitioner did not want to withdraw his plea.  (See Sentencing Transcript at 3).

 Moreover, this Court finds credible the testimony of Mr. Musselman that he did discuss withdrawing the plea with Petitioner.  At the post conviction hearing, Stephen Musselman explained that he advised the Petitioner about withdrawing his plea and "walked him through" withdrawing the plea.  (Post Conviction Hearing at 3:42 pm.).  Mr. Musselman further explained that Petitioner did not want to put his stepdaughter through a trial, and testified that Petitioner otherwise did not want to withdraw his guilty plea.

(Answer, Ex. 7, Amended Opinion and Order 22-23, ECF No. 4-7.)

Mr. Musselman testified at the November 15, 2012, post-conviction hearing that, after being appointed to represent Stemple, they discussed Stemple's options and whether Stemple wanted to withdraw his plea.  ((Respondents' Ex. 10, Post-Conv. Hrng. Tr. 193, 195, 199-200.)

He elaborated that:

Ah, I started kind of at ground zero going through discovery, going through with him what the State claimed happened, explaining again he had no burden to, he, he had no obligation to assist in any way, shape, or form in the prosecution of himself.  I walked him through what your evidence appears to be based on the discovery, based, the pros and cons of going forward to trial, if he did seek to ... move to, to withdraw his plea it would put him back at ground zero with me. Talked through those options with him.  It looks like I met him a few times on succ -- successive days.  I think that was in the context of seeing if I could renegotiate with you to come down off the plea agreement that was already had. So it was pretty much kind of an accelerated trial preparation because for him to make a knowing and intelligent decision of whether or not to seek to withdraw his plea I had to be able to advise him.  So I kind of walked him through all his options.

(*Id.* at 195-96.)  Mr. Musselman's testimony continued:

Q      And during those conversations with him did he come to a decision with

regard to how he wanted to proceed?

A      He wanted to go forward to sentencing.

Q      All right.  And did he indicate to you, that to you prior to August 4th of

2011 when he was sentenced?

A      Yes.  The times I met with him at the detention center --

....

Q      So ... that communication or that position that he took was communicated to you at the detention center?

A      Correct.

Q      Okay.  And by the time you came to sentencing on August 4th had he wavered in that decision?

A      No. By that point he did not want to set aside his plea.  We, we had that discussion often just because I have to make sure he's willfully, he has to make an informed decision on any choice he makes.  So I had that discussion with him often.  Especially adding the new element that Ms. Drawbaugh may be a, a witness for him at any future trial.

Q      Well, um, and also it's fair to say that, that a new element that was introduced since he pled was that, that there was a potential recantation from the victim, correct --

A      Correct.  Correct.  And he --

Q      Okay --

A      --he waived that and I also shared with him my interviews with his wife and ultimately the taped phone conversations but her opinions, her contact with the daughter.  She wasn't living in, in the home.  Um, her financial struggles, her trying to give his stepdaughter guidance, putting [his] stepdaughter through trial.[14] So I had many discussions with him, but prior to court his decision was made that he wanted to go forward to sentencing. ...

(*Id.* at 199-200.)[15]  The Assistant State's Attorney added:

---

[14] It was important to Stemple, Mr. Musselman stated, not to put his stepdaughter through a trial.  (*Id.* at 196.)

[15] On March 10, 2011, between the plea and sentencing hearings,  the victim visited plea counsel's office with her mother, seeking to recant her allegations that she had been sexually abused between August 1, 2009-July 22, 2010, the charge to which Stemple had entered the *Alford* plea.  (Answer, Ex. 3, Sent. Hrng. Tr. 4-5, ECF No. 4-3; *id.*, Ex. 7, Amended Opinion and Order 6, ECF No. 4-7.)  Counsel believed that the victim had been coerced into recanting these allegations and subsequently withdrew as Stemple's attorney.  (Answer, Ex. 3, Sent. Hrng. Tr. 4-5, ECF No. 4-3; *id.*, Ex. 7, Amended Opinion and Order 6, ECF No. 4-7.)  Stemple was later charged with witness tampering.

Q        Okay.  And as a matter of fact I put it on the record the day that, that we did come forward to sentencing that, that this was one of the potential reasons that he could, ah, withdraw his plea because this information had come out.  But instead he was choosing not to.

A        Correct.

(*Id.* at 202.)  Mr. Musselman subsequently became aware that Stemple's stepdaughter had, in

essence, disavowed her recantation and indicated that her initial disclosure was true.  (*Id.* at 201.)

Asked directly if Stemple ever asked him to withdraw the plea, Mr. Musselman responded "No."

(*Id.* at 202.)

Stemple, on the other hand, testified that he specifically asked sentencing counsel to

withdraw the guilty plea:

Q        Okay.  Now this is not in your allegations, but I did file a supplemental petition on this issue.  Did you specifically ask Mr. Musselman to try to withdraw your guilty plea?

A        Yes ma'am, I did.

Q        Okay.  And what was his response to you about that?

A        I'll be back to you.

....

Q        So when Mr. Musselman stated at your sentencing hearing that you did not want to withdraw the plea, was he being truthful?

A        He did what?

Q        In your, on your, at your sentencing he indicated that you did not want him to set aside the plea or seek to set aside the plea.  He was prepared to go forward to sentencing.  Was he being truthful there?

A        I, he never said that when I was present.  Never heard him say that.

---

(*Id.*, Ex. 7, Amended Opinion and Order 26, ECF No. 4-7.)  The victim never took back her statement regarding the July 23, 2010, sexual abuse, nor did Stemple ever deny that charge.   (Respondents' Ex. 10, Post-Conv. Hrng. Tr. 70, 159-61.)

(*Id.* at 40-42.)  Asked if Mr. Musselman told him that withdrawing the plea was not an option,

Stemple stated:

> He told me that if he withdrew my plea, um, it wasn't that bad of a deal, I was
> facing a whole lot worse time, just that it was probably best if I just went with the
> deal 'cause it wasn't that bad of a deal.  That was what his whole words always
> was, it was not that bad of a deal.  Mary Drawbaugh already made the deal.  He'd
> just inherited the case.  That's what I kept hearing from him.

(*Id.* at 43.)

On cross-examination, Stemple continued to assert that he did not hear, or recall, Mr.

Musselman stating that he was prepared to go forward with the plea.  (*Id.* at 148-52.)  Questioned

as to why he did not raise his hand and say that he did not want to proceed with the plea, Stemple

responded "I don't remember nobody asking me."  (*Id.* at 152.)   Asked why, if he truly wanted

to withdraw his plea, he did not say so, (*id.*), Stemple ultimately replied: "I took the advice of my

attorney and that's what happened," (id. at  154).[16]

Again the post-conviction court credited the testimony of Mr. Musselman over Stemple's

testimony.  As noted above, this court presumes that the state court's factual findings, including

its credibility findings, are correct.   *See* 28 U.S.C. § 2254(e)(1); *Sharpe*, 593 F.3d at 378.

Stemple has also failed to rebut the correctness of the state court's factual findings with respect

to this claim.  28 U.S.C. § 2254(e)(1).  He has provided nothing more than his allegation that he

asked Mr. Musselman to withdraw his plea and that Mr. Musselman refused.  Thus, there is no

basis to conclude that Mr. Musselman's performance was deficient.

The sentencing hearing transcript provides ample support for the circuit court's findings.

---

[16] In fact, on further cross-examination, Stemple conceded that he could have told Mr. Musselman that he did not
want to withdraw the plea.  (Respondents'  Ex. 10, Post-Conv. Hrng. Tr. 164.)

At the outset of the August 4, 2011, sentencing hearing, Mr. Musselman stated that Stemple "doesn't, did not want me to set aside the plea or seek to set aside the plea.  He's prepared to go forward to sentencing."  (Answer, Ex. 3, Sent. Hrng. Tr. 4, ECF No. 4-3.)  As the circuit court noted, Stemple did not object to counsel's statement, nor did he ask to speak to counsel.  (*Id.*)  Shortly thereafter, counsel stated that Stemple "does understand that if this were, or ... if this had gone to trial it would be very complicated, and he does not want to do that or put his step daughter through that."  (*Id.* at 6.)  During his allocution, Stemple stated that he "tried to make it as easy ... as [he] possibly could've by not draggin' her through, through no kind of more harsh ordeals."  (*Id.* at 18.)  These statements are reflected in Mr. Musselman's testimony during the post-conviction hearing, which, as noted above, the circuit court credited.

Even assuming that Stemple asked Mr. Musselman to withdraw the guilty plea and Mr. Musselman failed to do so, Stemple cannot show that he was prejudiced by the alleged failure. At the outset of the sentencing hearing, the court stated that Stemple was facing fifty years on the two counts to which Stemple had entered a guilty plea and an *Alford* plea.  (*Id.* at 6.)  The Assistant State's Attorney noted that the sentencing guidelines ranged from fourteen to twenty-six years.  (*Id.*)  According to the plea agreement, the State could ask for the full fifty year sentence, but was bound by the guidelines and could not ask for more than twenty-six years executed.  (*Id.* at 7-8.)  With respect to the suspended portion of the sentence, the State would recommend a five-year period of supervised probation with certain special conditions.  (*Id.* at 8.) The defense was not bound by the guidelines and could argue for a lesser sentence.  (*Id.*)  The sentencing judge was not bound by the plea agreement.  (*Id.*)

The State's case was strong.  Not only did it have the testimony of an eyewitness, the victim, but DNA testing also supported the first count, to which Stemple pled guilty.  (*Id.* at 6.)

Thus, without the plea agreement, Stemple could have been convicted at trial (during which his stepdaughter would have had to testify) of all nine counts and faced a maximum of 225 years in prison. (Respondents' Ex. 10, Post-Conv. Hrng. Tr. 9.) With the plea agreement in place, although the circuit court did sentence Stemple to the maximum fifty years he faced for the two counts, it suspended the twenty-five years for Count Nine, to which Stemple had entered the *Alford* plea. (*Id.* at 20.) It cannot be said that withdrawing his plea under these circumstances would have been a rational choice. *See Padilla*, 599 U.S. at 372.

The post-conviction court, again, did not unreasonably determine the facts based on the evidence before it. 28 U.S.C. § 2254(d)(2). Moreover, although the circuit court's ruling was based on its factual findings, Petitioner has not demonstrated to this court either that counsel's conduct fell below what would reasonably be expected of counsel under prevailing norms or that he was prejudiced by any alleged errors by counsel. He, therefore, has not met the *Strickland* standard, 466 U.S. at 687-88, and his ineffective assistance of counsel claims must be denied.

### B. State's Attorney's Error

In his second ground for relief, Stemple alleges that the Assistant State's Attorney erred by "read[ing] behind the plea agreement," by failing to present a true victim impact statement but one of her own, and by stating her own belief. (Pet. 6, ECF No. 1.) The circuit court denied this claim on the merits as well. (Answer, Ex. 7, Amended Opinion and Order 26, ECF No. 4-7.)

Although the allegation itself is vague, at the November 15, 2012, post-conviction hearing, his attorney asked Stemple to explain his allegation that the Assistant State's Attorney "read behind the plea agreement that she made to persuade the judge to give the time that he gave." (Respondents' Ex. 10, Post-Conv. Hrng. Tr. 59.) Stemple testified that the prosecutor told the sentencing judge that if the victim were to testify, she would testify that she was sexually

abused from the time she was twelve years old.  (*Id.* at 60.)  Stemple stated that he "did not plead

to no sexual conduct with no 12-year-old."  (*Id.*)[17]   He subsequently noted that the Assistant

State's Attorney "said [the victim], if [she] was to speak, well, [she] was sitting in the courtroom.

She had all the opportunities in the world to make an impact statement."  (*Id.* at 62.)  Stemple

stated that he did not believe that the court "would have give[n] [him] as much time" if the

prosecutor had not made her statement regarding when the sexual abuse began, especially after

the victim had recanted her original allegations.  (*Id.*)

> The post-conviction court construed these allegations as follows.

> Petitioner alleges that Prosecutorial misconduct existed where Judge Dwyer
> considered allegations made by the prosecutor, Ms. Angel, that Petitioner engaged
> in acts even though a "recant had been made" by the victim regarding those acts.

(Answer, Ex. 7 25, ECF No. 4-7)   The court found no merit to the allegation:

> Relief on this allegation is denied.  It was not improper for Ms. Angel to discuss
> the substance of each count.  The fact that the victim had recanted her statements
> regarding the circumstances of Court 9 did not change the fact that Petitioner had
> already entered an Alford plea as to Count 9, and was facing sentencing for the
> plea.  Moreover, ... the recantation formed the basis of the subsequent charges for
> witness tampering and the recusal of original Defense Counsel Mary Drawbaugh.

(*Id.* at 26.)

> The gist of Stemple's argument appears to be that he entered an *Alford* plea to conduct

which occurred when the victim was fifteen years old, not twelve, and that by erroneously stating

her age, the prosecutor went beyond the plea agreement and, in fact, broke the agreement.

(Respondents' Ex. 10, Post-Conv. Hrng. Tr. 60.)   Moreover, Stemple opined, the prosecutor

should not have argued about allegations of conduct that had been recanted.  (*Id.* at 62-63.)

---

[17] Stemple stated that the victim was sixteen years old on July 23, 2010, the charge to which he entered a guilty plea, and fifteen during the time covered by the *Alford* plea.  (Respondents' Ex. 10, Post-Conv. Hrng. Tr. 60.)

Asked by post-conviction counsel if there was anything further he wanted to say about his prosecutorial misconduct claim, Stemple stated:

> Basically I don't think Judge Dwyer would have give me as much time if Lindell Angel would not have said nothing about [his stepdaughter] being 12 years old ... and how she was abused since she was 12 years old especially after on March the 15th when, when Mary Drawbaugh made this statement to Judge Dwyer that a recant was made.  Mary, Mary Drawbaugh and Lindell Angell was at the bench with, with Judge Dwyer and Judge Dwyer said I thought there was allegations and, and DNA to proof everything.  Lindell Angel said absolutely no.  On the paper she said no.  There's only allegations to prove on the 23rd day of July.  So to my opinion is if you only knew you could prove to the 23rd day of July, why are you talking about the 12th when you, you made the deal, not me.  From 15 years old to 16 years old.  Not 12 years old.  Not 13 years old.  Not 14 years old. I mean ... you made the deal and then you turned around and you whelched [sic] on the deal.  You went behind the deal.  You, you made the judge believe that I was basically, it was from 12 years old on out.

(*Id.* at 62-63.)

With respect to his allegation that the victim "had all the opportunities in the world to make an impact statement," (*id.* at 62), Stemple was cross-examined on that point during the post-conviction hearing:

> Q      Okay. ...   At, at the sentencing, um, your testimony was that, ah, [the victim] did not give a victim impact statement, correct?
>
> A      She didn't.
>
> Q      Okay.  You understand that, that Mr. Musselman could not force her to say anything, right?
>
> A      Yes.
>
> Q      And she was offered the opportunity to say something, correct?
>
> A      I never heard nobody ask her,
>
> Q      All right.
>
> A      If she wanted to say anything.

Q       But nobody can force her.  You understand that nobody can force her to say anything, correct?

A       Yeah.

Q       All right.  Not even Mr. Musselman.

A       But I remember you saying if [she] was to say an impact statement you gave what she would say.  You said what you, your, you gave [her] as if [she] ... you, when you spoke you said if [she] was to give an impact statement this is what she would basically say.

Q       I indicated what [she] told me.  She didn't want to speak particularly --

A       But you didn't say that --

Q       -- herself.

A       You said if.  You didn't say that was [her] words.  You were speaking for [her].

(*Id.* at 169-70)(fourth alteration in original).

The court makes several observations.  First, as previously discussed, the post-conviction court concluded that Stemple did not seek to withdraw his *Alford* plea.  Therefore, because Stemple was being sentenced on that charge, (Answer, Ex. 3, Sent. Hrng. Tr. 20, ECF No. 4-3), it was logical, not improper, for the prosecutor to describe the allegations which were the basis of the *Alford* plea, as the post-conviction court found.  Further, the circuit court was aware not only that the recantation had been made, but also that the victim had subsequently stated that her original statements were true.  (*Id.*, Ex. at 5.)   Second, there is no evidence that the Assistant State's Attorney made the statement that the sexual abuse began when the victim was approximately twelve years old in order to persuade the sentencing court to impose a longer sentence.  Rather, it appears from the record that she simply misspoke.[18]  Third, the court was

---

[18] The court has reviewed the plea and sentencing hearing transcripts in their entirety and has found no other

well aware of the terms of the *Alford* plea, as they were described several times during the plea hearing.  (Ex. 2, Plea Hrng. Tr. 4, 6, 11, 19, ECF No. 4-2.)   The sentencing court was also cognizant of the time frame of the events which formed the basis of the *Alford* plea.   The Assistant State's Attorney, in describing the State's evidence at the plea hearing, gave the victim's date of birth and stated that she "was 16-years-old when these events occurred."  (*Id.* at 21.)   The prosecutor further stated that the victim "would, uh, testify that, that from the time frame of, uh, I believe August of 2009 through July 22nd, 2010, ... she was sexually abused by the Defendant during that time."  (*Id.* at 23.)   The court referred to the same time frame during the plea colloquy.  (*Id.* at 8, 11, 19.)   At the sentencing hearing, the circuit judge stated that because it had been so long between the plea hearing and Stemple's sentencing, he "went back and re-read everything" the previous night.  (*Id.*, Ex. 3, Sent. Hrng. Tr. 9.)  Thus, even though the Assistant State's Attorney misstated the victim's age during the sentencing hearing, the effect of that misstatement would have been negligible, given the court's knowledge of the case.  Finally, as is clear from the testimony quoted above, Stemple knew that his stepdaughter could not be forced to make a victim impact statement in open court.  (Respondents' Ex. 10, Post-Conv. Hrng. Tr. 169.)  Whether the prosecutor did or did not say that the victim impact statement was in the victim's own words is a question of semantics, nothing more.

The post-conviction court did not unreasonably determine the facts based on the evidence before it.   28 U.S.C. § 2254(d)(2).   There is no basis for a charge of error on the part of the Assistant State's Attorney.  *See Sharpe*, 593 F.3d at 378.

---

reference to the victim being twelve years old when the events to which Stemple entered the *Alford* plea began.  *Cf. United States v. Scheetz*, 293 F.3d 175, 186 (4th Cir. 2002)(noting no more than slight prejudice to defendant from single, isolated comment, although concededly improper).

### C. Judicial Error

Stemple claims in Ground Three that the sentencing judge erred in failing to: (1) drop the *Alford* plea because there was no evidence to prove Count Nine; and (2) failing to inform him that he only had a limited period of time to withdraw his guilty plea. (Pet. 6, ECF No. 1.) The circuit court denied both claims of error on the merits and, with respect to the second part of his claim, also on procedural grounds.

Regarding Stemple's allegation concerning the *Alford* plea to Count Nine, the court stated:

> Petitioner alleges that judicial error exists where the Judge was aware a "recant had been made" but no motions were made.

> ANSWER

> Relief on this allegation is denied.  This allegation suggests that Judge Dwyer should have taken action because the victim had recanted certain accusations which had been included in the facts presented to establish elements of Count 9. However, Petitioner has presented no law supporting the allegation that judicial error exists where a judge fails to take action upon a recantation of an accusation by a witness or victim in a criminal sentencing.  *See Ledbetter,*[19] *supra* at 645. This Court finds that Judge Dwyer had no obligation to consider in his sentencing the fact the victim recanted her story, especially considering that the Petitioner was facing new witness-tampering charges regarding said recantation.

(Answer, Ex. 7, Amended Opinion and Order 27-28, ECF No. 4-7.)

Similarly, Stemple has provided no legal authority, federal or otherwise, to this court which would cast doubt on the circuit court's ruling that the sentencing judge was not required to take action upon a victim's recantation of her accusations.  As quoted above, Stemple argued (in the context of his prosecutorial error claim) that the allegations which had been recanted were the only evidence supporting the sexual abuse of a minor charge in Count Nine.  (Respondents'

---

[19] *Ledbetter v. Warden of Maryland Penitentiary*, 234 Md. 643, 645 (1964).

Ex. 10, Post-Conv. Hrng. Tr. 62.)    However, Stemple overlooks the fact that the victim subsequently informed the Assistant State's Attorney that her original allegations, the subject of the *Alford* plea, had occurred as she originally described them.  (Answer, Ex. 3, Sent. Hrng. Tr. 5, ECF No. 4-3.)   The sentencing court was entitled to determine which of the victim's statements to believe, especially in light of the witness tampering charges, and this court must defer to that credibility determination.  28 U.S.C. § 2254(e)(1); *Sharpe*, 593 F.3d at 378.

As for the claim that the sentencing judge's failure to inform Stemple that there was a limited time period to withdraw his plea was error, the post-conviction court found otherwise:

> Petitioner alleges that judicial error exists where the sentencing judge did not tell Petitioner he could withdraw his plea.

> ANSWER

> Relief on this allegation is denied.  Petitioner has presented no law supporting the allegation that judicial error exists where a judge fails to inform a defendant that he could withdraw a plea.  *See Ledbetter v. Warden*, 234 Md. at 645. Moreover, ... this Court finds that Mr. Musselman clearly stated at the sentencing hearing, without objection from the Petitioner, that Petitioner did not wish to withdraw his guilty plea (Sentencing Hearing Transcript at 3-4).  Finally, by failing to object to this evidence at the sentencing hearing, Petitioner has waived this allegation.

(Answer, Ex. 7, Amended Opinion and Order 26, ECF No. 4-7.)

Stemple has provided this court with no authority to support his claim of judicial error. Nor do the facts of the sentencing hearing support Stemple's allegation, as the post-conviction court found.  Stemple had ample opportunities during the sentencing hearing to say that he wished to withdraw his plea, including when Mr. Musselman made the statement referenced above by the post-conviction court. (Respondents' Ex. 10,  Post-Conv. Tr. 73-76, 148-53, 164.)

Moreover, as previously discussed with reference to Stemple's ineffective assistance of counsel claim, the post-conviction court did not find credible Stemple's testimony at the post-

conviction hearing that he had asked Mr. Musselman to withdraw the plea. (Answer, Ex. 7, Amended Opinion and Order 23, ECF No. 4-7.). Rather, the court found Mr. Musselman's testimony credible.

Once again, the circuit court did not unreasonably determine the facts based on the evidence presented to it. 28 U.S.C. § 2254(d)(2). Its credibility findings are entitled to deference. *Id.* § (e)(1); *Sharpe*, 593 F.3d at 378. To the extent the issue presents a question of state law, this court will not second-guess the state court's finding. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Accordingly, the court finds Stemple's judicial error claim to be meritless.

### D. Illegal Sentence [20]

At the August 4, 2011, sentencing hearing, Stemple was sentenced to a total of fifty years in the Division of Correction, consecutive terms of twenty-five years each for Counts Three (to which Stemple pled guilty) and Nine (to which Stemple entered the *Alford* plea), with five years probation upon his release  (Answer, Ex. 3, Sent. Hrng. Tr. 20, ECF No. 4-3.)  The court suspended the twenty-five years for Count Nine, leaving Stemple with twenty-five years to serve. (*Id.*)  Stemple appears to argue that he should have received only seven to thirteen years, unless the Pre-Sentence Investigation Report ("PSI") revealed that he had a violent past. (Pet. 5, ECF No. 1.)  He contends that the PSI did not reveal a violent past and that, therefore, he should not have received a sentence at the top of the Guidelines. (*Id.*)  He seeks a reduction in his

---

[20] Although Stemple did not raise a specific claim of illegal sentence in his state post-conviction proceedings (as construed by the circuit court), several of his ineffective assistance of counsel claims related to his sentence. (Answer, Ex. 7, Amended Opinion and Order 3-4, ECF No. 4-7.)

sentence to a maximum of thirteen years on Count Three, but states that his sentence for Count Nine should remain suspended. (*Id.*)

Stemple testified at the November 15, 2012, post-conviction hearing that he understood from his then-counsel Mary Drawbaugh that the plea agreement was for him to receive a seven to thirteen year sentence. (Respondents' Ex. 10, Post-Conv. Hearing Tr. 26.) According to Stemple, he was told by his subsequent attorney, Stephen Musselman, that he would not do time on his *Alford* plea of guilty to Count Nine. (*Id.* at 40.) Asked by post-conviction counsel at the hearing why he believed his sentence was illegal, Stemple testified that he pled to a charge for which he would receive a seven to thirteen year sentence and that he would not serve any time on the *Alford* plea. (*Id.* at 50-51.)

> Q        Okay. The next allegation of error is "Musselman ... would not file for an illegal sentence." Um, I'll begin with why do you believe your sentence was illegal in this case?
>
> A        'Cause I pled, I pled out to a charge from, from seven to thirteen years and he told me basically ... that I would have, would not have to worry about the alpha (sic) plea. So to my common knowledge and to my beliefs I would receive a seven to a thirteen year sentence. If I was to receive anything beyond the seven to thirteen years, um, on an alpha (sic), on like the alpha (sic) I would get like 13 years, it would be suspended. Then I would do 13 years on count -- on the, on the guilty plea.

(*Id.*) Stemple explained that:

> A        [W]hat Mary allowed me to believe, Ms. Angel, was that, and after I pled out guilt -- I pled this charge, when the pre-sentence investigations and stuff would be all done we would come back, we would have a sit-down and we would go over paperwork and stuff and things would work themselves out. It, and that's what to my common knowledge --
>
> Q        Work themselves out.
>
> A        Yeah. Such as - -

Q       Sir, you understood that you were facing, it was very clear to you that you were facing 50 years of incarceration after you pled to these two offenses, correct?

A       After Mr. (sic) Dwyer said so, yes.

Q       Well.

A       But, that's what I'm saying, I had no common knowledge to what the actual, whenever, Mary never prepared me for whenever I went out to sit on the bench to what Dwyer was actually gonna tell me that I was facing and all that.

Q       Okay.  Well, then so now you're saying you didn't understand it.

A       No.  Not, not that I was really gonna look at 50 years until after he said it ....

(*Id.* at 72-73.)

At the post-conviction hearing, Stemple was cross-examined about the plea colloquy, during which colloquy he agreed that he understood the charges, the plea agreement, and the potential sentence.  (*Id.* at 74-77; Answer, Ex. 2, Plea Hrng. Tr. 9-15, ECF No. 4-2.)  At the plea hearing the court questioned Stemple at length regarding the possible sentence:

Q       Do you understand the maximum sentence of each of these charges is 25 years in the Division of Correction?

A       Yes, sir.

Q       They can be added together, which means consecutive, so you are facing 50 years in the Division of Correction.  Do you understand that?

A       Yes.

...

Q       At the sentencing, when we come back to sentencing, Ms. Angel is going to request that I impose a lengthy sentence, and Counsel have agreed, she's promised, that she will not ask for time in the Division of Correction, which is not within the sentencing guidelines.  Do you understand that?  That's for executed time.  Do you understand that?

A      Yes, sir.

Q      She has calculated the guidelines for overall, meaning for both counts at 14 to 26 years.  Do you understand that?

A      Yes, sir.

Q      Now, when you come back for sentencing if you and Ms. Drawbaugh don't agree with that calculation then I will hear arguments from both of you and I will make a determination as to what the proper guidelines are.  Do you understand that?

A      Yes, sir.

Q      And whatever the proper guidelines are she will ask for executed time within that.  Do you understand that?

A      Yes, sir.

Q      Now, do you further understand this is a non-binding plea, and I'm free to impose any sentence I feel appropriate up to the 50 years in the Division of Correction.  Do you understand that?

A      Yes, sir.

Q      However, do you also understand that Ms. Angel is going to ask that I impose a lengthy sentence and suspend all but a sentence within the guidelines, which will be time for you to serve.  Do you understand that?

A      Yes, sir.

Q      And upon release she's going to replay (sic), request that you be placed on a period of five years of supervised probation.  Do you understand that?

A      Yes, sir.

Q      If you would violate the probation any suspended sentence could be imposed.  Do you understand that?

A      Yes.

Q      Now I'm just, just the way of an illustration, because I haven't seen the pre-sentence investigation, I haven't seen the mental health assessment and they have, we haven't made a final determination as to what the guidelines are.  Do you understand?  I just want you to understand this.

A      Yeah.

Q      If I should give you a sentence of 50 years, suspend all but 20, if you would violate the probation then you would be facing 30 years.   Do you understand that?

A      Yes.

Q      So you understand the princip[le] of that.  Is that correct?

A      Yes.

(*Id.* at 12-14.)   The court went on to inform Stemple that he would have to register as a sex offender for life, and Stemple responded that he understood.   (*Id.* at 14-15.)   The circuit court could not have been more clear with respect to the possible sentence Stemple was facing.

On further cross-examination at the post-conviction hearing, the Assistant State's Attorney asked: "Tell me, sir, where in this transcript it says you're gonna get seven to thirteen years?"  (Respondents' Ex. 10, Post-Conv. Hrng. Tr. 77.)   Stemple responded that he did not know.  (*Id.*)

Q      And you hear[d] what I just read to you, that the State, me, is gonna be asking that you be sentenced within the guidelines of 14 to 26 years.

A      Yeah.  That's seven to thirteen years apiece.

Q      That's true.  Okay --

A      So there's the seven --

Q      --but the total you're --

A      --to thirteen years - -

Q      --facing is 14 to 26 years.

A      Yeah.

Q      Where does it say the total you're facing is seven to thirteen years?

33

A       It, from my understanding I wasn't never gonna see, see no time out of the alpha (sic) plea.

(*Id.* at 78.)  Stemple elaborated that Ms. Drawbaugh "left me to believe that once everything was done we would go back and we'd go over things.  As long as my stuff was not, my, my pre-sentence investigation wasn't violent I was looking at seven to thirteen years.  The alpha (sic) plea would never come in effect."  (*Id.* at 78-79.)

Stemple alleges that Mr. Musselman also led him to believe that he would receive no time pursuant to the *Alford* plea, and that the plea was "really not that bad of a deal."  (*Id.* at 40.) Again the sentencing transcript belies Stemple's contention that he was misled into believing he would receive a lesser sentence than he, in fact, received.

At the outset of the sentencing hearing, the court reviewed the maximum time Stemple faced, fifty years; the sentencing guidelines, fourteen to twenty-six years; and the terms of the plea agreement, that the State was bound by the guidelines and could not seek more than twenty-six years executed (although it could ask for the fifty years), the defense could argue for a sentence below the guidelines, and the judge was not bound by the plea agreement.  (Answer, Ex. 3, Sent. Hrng. Tr. 7-8, ECF No. 4-3.)  Ms. Angel did, in fact, ask the court to impose a fifty year sentence, with all but twenty-six years suspended, in the Division of Correction.  (*Id.* at 14.) Mr. Musselman asked the court to sentence Stemple to eighteen months local jail time to allow him to support his family.  (*Id.* at 15; Respondents' Ex. 10, Post-Conv. Hrng. Tr. 55, 212.)

Stemple testified at the post-conviction hearing that he remained silent regarding his lack of understanding of the potential sentence because he was following the advice of counsel. (Respondents' Ex. 10, Post-Conv. Hrng. Tr. 154, 156, 187.)   Despite Stemple's multiple references to counsels' advice, however, his attorneys' testimony contradicted his statement.

Both plea counsel and sentencing counsel testified at the post-conviction hearing.  Asked

whether she told Stemple that he was facing only seven to thirteen years, Ms. Drawbaugh said

that she had not:

> Q      Did you ever tell the Defendant that he would be facing seven to thirteen
> years?
>
> A      No.  I, on each count I did.
>
> Q      Right.  But a maximum penalty.  That he would only receive --
>
> A      No --
>
> Q      Seven to thirteen years in jail.
>
> A      No. What I told him was that I was not the judge and that the judge under
> the plea agreement could give him the maximum of 50 years.

(*Id.* at 103.)

> Q      Okay.  Um, prior to your withdrawal, now you, you  heard the Defendant
> testify that on multiple occasions you told him that not to worry, that, um, you
> would get a sentence, that he would get a sentence between seven and thirteen
> years, that he wouldn't be sentenced for the Alford plea count.  Did you ever
> indicate to him ... that he would get a sentence or that the State would be asking
> for anything less than 14 to 26 years?
>
> A      No.

(*Id.* at 113-14.)

Mr, Musselman, too, testified that Stemple was aware that his guidelines were fourteen to

twenty-six years and that the State was capped at twenty-six years.  (*Id.* at 197.)

> Q      Did he ever indicate to you that he was only to get seven to thirteen years
> because he didn't have a violent past?
>
> A      No.
>
> Q      Did he ever indicate to you that Mary Drawbaugh had promised him that
> he would only get seven to thirteen years because he didn't have a violent past?

    A      No.

(*Id.* at 198.) Mr. Musselman's testimony continued:

    Q      Okay.  Did you ever tell the Defendant that seven to thirteen years was all he could get at sentencing?

    A      No.

    Q      Did you ever tell the ple -- the Defendant that he would not do any time on the Alford plea and not to worry about it?

    A      No.

(*Id.* at 202.)

Stemple's testimony that at all times he thought he would only receive seven to thirteen years, (*id.* at 86),[21] rings hollow in light of the foregoing.  Moreover, Ms. Angel played a recording of a conversation between Stemple and his wife in which he told her that the maximum sentence he was facing was twenty-six years.  Stemple stated: "Twenty-six years is the most that they can give me.  I'll be home within 14 years of that one."  (*Id.* at 139.)  He repeated: "Twenty-six years.  But I'll do half of it ...."  (*Id.*)

Whether or not Stemple actually believed the maximum sentence he could receive on each count was seven to thirteen years, and that he would serve no time pursuant to the *Alford*

---

[21]    Q      Okay.  Now your testimony is that despite what's in the transcript, in the questions and what Judge Dwyer told you was the maximum penalty, what he told you that I was gonna be asking for at sentencing, your testimony here today is that you thought at all times you were just gonna get seven to thirteen years --

    A      To thirteen years --

    Q      --correct?

    A      Yes.

(*Id.* at 86.)

plea, is arguable.  Even if true, however, a defendant's misunderstanding of a potential sentence does not render that sentence illegal.  Stemple was informed—twice—by the circuit court of the terms of the plea agreement and the possible sentence he was facing and never voiced any lack of understanding during the plea and sentencing hearings.  To now claim that he failed to do so because he was following the advice of counsel (both of whom deny giving such advice) and believed "things would work themselves out" is not sufficient to demonstrate that Stemple is being held in custody illegally or unconstitutionally.  *See* 28 U.S.C. § 2254(a).  Stemple's final claim is baseless and is rejected.

Three of Stemple's claims—prosecutorial error, judicial error, and illegal sentence—have been procedurally defaulted.  Even if that were not the case, however, those claims fail on the merits, giving due deference to the state court's factual findings.  Stemple's ineffective assistance of counsel claims are also meritless.  The petition, therefore, will be denied and dismissed.  A separate order follows.

## CERTIFICATE OF APPEALABILITY

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To meet this burden, an applicant must show that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues were 'adequate to deserve encouragement to proceed further.'"  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)(quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)).  Stemple has failed to make a substantial showing that he was denied a constitutional right, and the court finds that reasonable jurists would not find the denial of habeas relief in this case debatable.  Accordingly, a certificate

of appealability shall not issue.[22]

## CONCLUSION

For the above reasons, the court concludes that Stemple's petition provides no grounds for habeas corpus relief.   A separate order follows denying and dismissing the petition with prejudice and declining to issue a certificate of appealability.


November 30, 2016                                    _____/S/_____
Date                                                              Catherine C. Blake
                                                                      United States District Judge

---

[22] Denial of a certificate of appealability in the district court does not preclude Stemple from requesting one from the court of appeals.